**Stephen D. HOFFMAN, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 97–4105–RDR.**

United States District Court, D. Kansas.

Aug. 30, 1999.

---

Kenneth M. Carpenter, Carpenter Chartered, Topeka, KS, Kelly C. Brown, Topeka, KS, for Stephen D. Hoffman, plaintiff.

Nancy Landis Caplinger, Office of United States Attorney, Topeka, KS, for John J. Callagan, Commissioner of Social Security, defendant.

### *MEMORANDUM AND ORDER*

ROGERS, District Judge.

This is an appeal from the denial of social security disability benefits. It is undisputed that plaintiff currently is disabled from gainful employment. The issue in this case is whether defendant was disabled from such employment after September 10, 1987 and before September 30, 1988, his last day of insured status. This case has a long history which the court shall not attempt to recount here. Part of that history includes a remand order by this court upon the motion of the defendant for findings regarding the substance and credibility of the testimony or opinions of plaintiff, his wife, and two treating physicians. (Tr. 729). This case is now back from remand.

Of course, our review is to determine whether the findings of fact are supported by substantial evidence based on

the entire record, and to ascertain whether the correct legal standards have been applied. *Castellano v. Secretary of Health & Human Services,* 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Soliz v. Chater,* 82 F.3d 373, 375 (10th Cir.1996) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

■ Many of the facts in this matter are uncontested. Plaintiff was born on October 16, 1946. He has a high school education. He was a corpsman in Vietnam in 1967–68. During part of his service in Vietnam, plaintiff was responsible for triage on a naval medical ship. He suffered a nervous breakdown during his tour in Vietnam. His last substantial employment was doing rigorous labor for a pipeline company in 1981. Plaintiff has twice had back surgery—disc surgery in 1976 and a secondary fusion in 1981. Plaintiff has been diagnosed with severe post-traumatic stress syndrome and major depression with disabling anxiety and physical malfunctioning. This condition was considered totally disabling by the Department of Veterans Affairs as of October 27, 1989. Whether this mental condition together with plaintiff's back condition rendered him disabled from substantial gainful employment in 1987 and 1988 is the issue in this case.

Dr. Jack Rowlett, plaintiff's treating physician over many years, wrote on October 22, 1990:

Stephen Hoffman has a record of back pain, anxiety and inability to work going back to 1971. During that time I saw him on many occasions and referred him to many specialists without any real satisfactory results. I know he was depressed most of the time, very anxious and was unable to work.

In retrospect, I am sure that Stephen's problems were due to his military service which I have found out was very traumatic. I feel that the Post Trau-matic Stress Syndrome could account for his problems and most certainly came from his Vietnam experience.

(Tr. 399). Earlier in 1990, Dr. Rowlett wrote that from 1972 to November 1988 plaintiff had a great deal of low back pain the treatment of which with drugs and surgery was unsuccessful. Dr. Rowlett attributed this lack of success to plaintiff's depression which he attempted to treat with various degrees of success. (Tr. 533).

Raymond Horton, a staff psychologist at the Colmery–O'Neil Veterans Administration Medical Center, wrote on October 10, 1990:

In my opinion, Mr. Hoffman developed PTSD as a result of his military experience as a Medical Corpsman in Vietnam 1967/1968, and has been suffering from this condition since his Vietnam experience. The severity of his PTSD since 1967/1968 has greatly contributed towards him being chronically depressed, extremely anxious and angry since 1967/1968.

Both group psychological test reports dated 7–17–89, 3–12–90 in his medical records, signed by me indicate the severity of his PTSD symptomatology.

I have provided individual psychotherapy for Mr. Hoffman, 1–2 hours a week for approximately 1 year. A major focus of therapy has been the area of PTSD symptomatology such as agoraphobia with panic attacks, severe depression coupled with suicidal ideations and rage.

(Tr. 400).

On July 7, 1992, Dr. Samuel Bradshaw, Chief of the Psychiatry Service at the Colmery–O'Neil VAMC, wrote:

Mr. Hoffman has been a patient at the Colmery–O'Neil VA Medical Center for many years and is 100% service-connected for Post–Traumatic Stress Disorder. There have been some questions about Mr. Hoffman's condition specifically as it relates to eligibility for Social Security. The question asked is whether Mr. Hoff-

man's PTSD symptomatology from 1982 to 1988 could have interfered with his mental ability to function in the work setting on a sustained basis. Mr. Hoffman has PTSD symptoms, specifically, racing thoughts, daily nightmares, weight loss, difficulty being around other people, difficulty sleeping, constant flashbacks, sweating, and in general, suspiciousness toward authority figures. These symptoms, I believe, would interfere with his ability to understand, carry out and remember instructions. Frequently, he would find that he wanted to concentrate on doing something useful either as hobby or as a volunteer, and the flashbacks and memories of Vietnam would interfere with this. In addition, his general mistrust of supervisory people get in his way of dealing appropriately with supervision and with coworkers. He needs to stay away from people and generally tries to avoid them. In addition, these symptoms interfere with his ability to respond appropriately to customary work pressures in a routine work setting. This is accentuated when given an order; usually these result in people such as Mr. Hoffman in quitting the job. This is not related to not wanting to work. Most of the people I have met want to work, but the remembrance of Vietnam and particularly remembrance of getting very poor orders that resulted in the death of others make it extremely difficult for them to deal with normal orders that go along with a job. So, in general, Mr. Hoffman has been unable to work since 1982 due to the symptoms of PTSD. Particularly, he would have had difficulty in working under supervision. Performing sedentary work is particularly a problem because his aggression could not be worked out physically in an effective way. (Tr. 536).

▆▆▆▆ "Generally, an ALJ must give controlling weight to a treating physician's well-supported opinion about the nature and severity of a claimant's impairments."

*Adams v. Chater*, 93 F.3d 712, 714 (10th Cir.1996). In this instance, the treating physicians have given retrospective opinions, which must be viewed with some caution. "While 'a treating physician may provide a retrospective diagnosis of a claimant's condition,' a 'retrospective diagnosis without evidence of actual disability is insufficient.' " *Coleman v. Chater*, 58 F.3d 577, 579 (10th Cir.1995) (quoting *Potter v. Secretary of Health & Human Services*, 905 F.2d 1346, 1348–9 (10th Cir. 1990)).

These retrospective diagnoses are consistent with the lay testimony of plaintiff's wife regarding plaintiff's condition in 1987 and 1988, as well as some of the few medical records which were made concerning plaintiff between 1982 and 1989. For instance, doctor's notes from the Miami County Clinic reflect a nervous condition for which prescription medicines such as valium were prescribed in 1982, 1984, 1985 and 1986. (Tr. 381–82). Also, Dr. Jackson noted in 1983 that plaintiff complained of chronic severe pain in his back and legs. (Tr. 475–76).

The ALJ in this case based his denial of benefits upon his review at step five of the five-step sequential process. While agreeing that plaintiff could not have performed his past relevant work, the ALJ concluded that plaintiff had the residual functional capacity in 1987 and 1988 to perform sedentary labor which was present in the economy. The ALJ based this decision upon the following evidence: 1) a June 1981 hospitalization in which plaintiff reported he had no major medical illnesses; 2) a June 1981 psychological report from Arnold Moskowitz, Ph.D.; 3) a residual functional capacity assessment from Dr. Jackson in 1982; 4) a May 1985 progress note; 5) a May 1987 progress note; and 6) various progress notes or summaries done after June 1989 when plaintiff sought treatment from the Veterans Administration and was diagnosed with severe post-traumatic stress disorder.

The court does not view these materials as providing substantial evidence in support of the ALJ's conclusion. We shall discuss the materials in the above-listed order. Dr. Jackson's notes from June 1981 indicate that plaintiff had "incapacitating" low back pain. (Tr. 297). Plaintiff ultimately underwent a back fusion. No MMPI testing had been done when the notes were taken. Furthermore, this is six years before the time in question in this case.

When the MMPI and a "personal feelings survey" were taken in 1981, Arnold Moskowitz, Ph.D. made a report. The report stated in part:

Initially, the patient presented himself as a very likeable, easygoing, young man of 34 years who was complaining of left shoulder pain as well as back pain. The patient indicated that he had previously seen a marriage counselor because of marital problems between he and his wife some years ago, however, at this particular time the relationship is going rather well. Generally the patient seemed to deny having problems, but did indicate that he is still being troubled by some nightmares that have been with him ever since Vietnam when he returned in 1969. The patient noted that of 45 corpsmen, only 5 returned while he was serving in the Navy with Marine Corps, and of the 5 only 2 were able to walk back and he was one of the 2. He remembers some of the fire fighting and this bothers him considerably. However, it is unlikely that some of these past problems are contributing to his difficulty at the present time.

From his personal feelings survey, his level of anxiety was not significant. There was no indication of depression, no psychotic withdrawal, no acting out behavior. Significant areas of difficulty were related to his feelings about his father and feelings about his work. There was some indication of intrapsychic conflicts present.

In terms of qualitative information, some of the feelings that seemed to be most frequent were feelings of anxiety, confusion, hurt, hate, loneliness, anger, moodiness, sadness, restlessness and feeling worn out.

Overall, this man who has relatively good ego strength in spite of the fact that he seems to be experiencing some difficulty that even he may not be aware of. The patient's MMPI suggests an underlying hysterical pattern with elevations on the hypochondriacal scale as well as the hysterical scale. There were no indications of depression or anxiety reflected in the patient's MMPI profile. His profile is considered valid as well as his feelings on the personal feelings survey.

This patient's reality testing is quite good and there are no indications of serious emotional problem of the psychotic nature.

The overall diagnostic impression would be consistent with an hysterical syndrome.... I am certainly not doubting the validity of the patient's feelings of pain nor the presence of the physical pain.

(Tr. 298-99).

Raymond Horton, Ph.D., made a critical analysis of the Moskowitz report in 1993. Horton wrote:

On 8/3/93, Dr. Moskowitz forwarded the raw MMPI data on Mr. Hoffman that was administered 6/2/81. The 6/2/81 MMPI profile does present a clinical picture of someone with hysterical features as pointed out in his 6/3/81 consultation report. Also, the 6/2/81 MMPI profile depression scale and anxiety scale do not reflect significant levels of depression or anxiety. However, Mr. Hoffman described very clear classic Post-Traumatic Stress Disorder (PTSD) symptoms that were mentioned in the 6/3/81 consultation report that were minimized by Dr. Moskowitz, i.e., nightmares, survival guilt, combative life threatening incidents, and denial. For

example, the patient described that he was one of two corpsmen in a group of 43 who was not killed during his tour of duty in Vietnam. Furthermore, Dr. Moskowitz refers to a Personal Feelings Survey that was used in his 6/3/81 consultation report to assess depression and anxiety. My discussion with Dr. Moskowitz over the phone on 7/2/93 revealed that he constructed this Personal Feelings Survey, no other psychologist has used it, it has no known reliability or validity, and no known normative sample. Therefore, in my professional opinion, Dr. Moskowitz's reference of assessing depression and anxiety with the Personal Feelings Survey in the 6/3/81 consultation report was inappropriate and not reliable.

The 6/3/81 consultation report also makes reference to the patient seeing a marriage counselor. The patient did indicate to the marriage counselor, Donald Janes, M.D., Fox Hill Medical Center, Leawood, Kansas (currently in private practice in Garnett, Kansas) in 1976, prior to seeing Dr. Moskowitz, that he was struggling with nightmares from Vietnam, depression, and was experiencing panic attacks around others.

Mr. Hoffman's medical examination given upon entry into the United States Navy on September 29, 1965 (see attachment), indicates a history of a nervous condition, deformity in the back, and unexplained lesions on hands around age 15 that were treated with radiation. In my opinion, these unexplained lesions appearing at the age of 15 were symptoms of a budding hysterical condition.

The patient's medical records in Vietnam and USNHCS San Diego, California (see attached medical records dated 4/18/66, 12/30/67, 2/20/68, 5/12/68, 5/27/68), indicate he did suffer from hysterical and somatization disorder symptoms, such as pain and open lesions on hands and feet, anesthesia, parasthesia, gastrointestinal symptoms, and cardiopulmonary symptoms. The patient also showed me pictures of the open lesions on his hands and feet that were taken at the DaNang Hospital in Vietnam. It should be noted that exposure to prolonged or intense combative experiences are predisposing factors. The patient's combative Vietnam experiences exacerbated his tendency to resolve internal conflict by hysterical and somatization means.

In summary, the patient's ability to maintain gainful employment up until his work-related back injury in 1979, coupled with the support from his spouse, and his hysterical/somatization symptoms provided him with some relief in modulating PTSD symptomatology. However, shortly after the back injury and loss of employment status, the patient's hysterical/somatization coping strategies were not able to defend against the rage and repressed morbid horrors of his Vietnam experience. My 7/17/89 and 3/12/90 group psychological test reports portray a person who was feeling out of control with rage and on the verge of committing suicide because of no sustained relief from chronic severe PTSD symptomatology.

(Tr. 560-61).

The ALJ concluded that he did not find Horton's report worthy of much credence and that Horton did not convincingly discredit the findings of Moskowitz. These conclusions, however, do not acknowledge that Horton reviewed the same MMPI material as Moskowitz and that Horton has had many more opportunities to meet with plaintiff than Moskowitz. Nor does the ALJ directly address the reasons given by Horton for discrediting the Moskowitz report. The ALJ merely states that Horton fails to rebut Moskowitz. Finally, this is another instance in which the ALJ is relying upon a report made six years before the time in question.

The February 1982 report of Dr. Jackson appears to support a claim of disability rather than rebut one. The report states that:

—plaintiff "continues to complain of constant pain every single day in his lower back of a generally severe nature, sharp and shooting at times";

—plaintiff "states that he is unable to engage in any social, recreational or other activities because of his low back pain problems and as such, he feels that he is totally unable to work at all";

—"Range of motion of the back is very restricted and painful";

—"This man continues to have chronic incapacitating back pain following an L4 to the sacrum fusion done about 8 months ago. . . . I feel that I have little else to offer the patient at this time and that his back pain is going to be chronic and permanent. He would appear to be significantly disabled at this time";

—"His prognosis is obviously quite guarded and very poor."

(Tr. 465–66). These comments are consistent with the notes of Dr. Jackson in 1981 and 1982. (Tr. 324–26). More importantly, the comments are consistent with Dr. Jackson's statement in 1986 that, "Patient seems to be much disabled. Motion is dysynchronous." At that time, the doctor recommended hospitalization for further testing, but plaintiff declined. (Tr. 326–27).

The ALJ's reference to a physical examination in 1987 is also inadequate to support the ALJ's findings. The examination found: complaints of back, leg and neck pain; slow range of motion, guarded and restricted in all planes; no motor deficits, and straight-leg raising at 90 degrees with complaints of low back pain. Ultimately, diagnosis was deferred. (Tr. 328).

The ALJ also made reference to a June 1989 mental status examination of claimant as grounds for rejecting the opinions of Horton and Bradshaw. The court does not agree with the ALJ's assessment. The examination was conducted because plaintiff checked himself into the VA Hospital with symptoms of severe depression. He was having recurrent nightmares and flashbacks. We acknowledge that plaintiff was alert and oriented, his memory was intact, and his judgment and insight were fair. He was not homicidal or suicidal. Nevertheless, he was hospitalized, diagnosed with post-traumatic stress disorder and major depression, maintained on medication, and not discharged until August 11, 1989.

The ALJ also made reference to a July 1989 clinical note which indicated that plaintiff maintained steady employment from 1969 through July 1989. (Tr. 541). There is nothing else in the record to support the fact that defendant engaged in substantial work after 1982. This appears to be a clerical error and provides no support for the ALJ's conclusion.

The ALJ refers to a progress note which states that plaintiff was not interested in vocational rehabilitation in June 1989. (Tr. 340). This appears consistent, not inconsistent, with plaintiff's claims regarding his depression and overall mental status.

Next, the ALJ refers to more notes taken when plaintiff was receiving treatment for PTSD. There is a discharge disposition from a Dr. Das done in February 1990 which indicates that plaintiff was not homicidal or suicidal or a danger to himself when discharged and that he could return back to work. (Tr. 525). There are notes from an admission to the hospital in November 1989. Again, plaintiff was not homicidal or suicidal, but he had recurrent nightmares and flashbacks and was experiencing problems with his medication. The ALJ also makes reference to a similar handwritten note made in November 1989. However, the ALJ does not appear to consider these parts of the reports in the context of plaintiff's treatment at the time. Namely, plaintiff was hospitalized for approximately 90 days on three different occasions between June 1989 and February 1990. He was diagnosed with PTSD and major depression. Furthermore, although he was considered ready to return to work according to a note in February 1990, an-

other note made the same month by the same Dr. Das at the VA Hospital indicated "that even when [plaintiff] is out of the hospital he could not succeed in working a job under ordinary circumstances because he does not seem able to tolerate the stress of ordinary give and take." (Tr. 353). Additionally, on March 27, 1990 it was concluded after an interview by a social service worker that plaintiff "appears to be severely impaired economically and socially due to his feelings of hopelessness, despair, irritability, anger, depression, rapidly changing moods, and low tolerance for frustration." (Tr. 532). Later records reflect additional psychiatric hospitalizations. (Tr. 743) (noting plaintiff's "eighth psychiatric hospitalization" in October and November 1993); (Tr. 889) (noting plaintiff's continuing "severe chronic PTSD symptoms" since 1989). Also, plaintiff has had outpatient treatment every couple of weeks since June 1989. (Tr. 1005). The ALJ did not appear to consider the post-June 1989 notes he mentioned in his opinion in this context.

Finally, to rebut the retrospective analysis of Drs. Bradshaw, Rowlett and Horton, the ALJ makes reference to plaintiff's service on the city council of Greeley, Kansas in 1987 and 1988. Greeley, Kansas has a population of approximately 300. The record indicates that plaintiff did not ask for the position on the council and refused to be mayor. Apparently, plaintiff was elected to the council by write-in votes. It is undisputed that his service on the city council did not constitute substantial gainful activity. For his service, plaintiff was paid ten dollars a month. (Tr. 1018). The council met monthly. (Tr. 1019). The court finds no substantial support from plaintiff's service on the Greeley city council for the conclusion that plaintiff was not disabled by PTSD in 1987 and 1988.

The ALJ states that plaintiff's activities during the time in question belie the alleged severity of his impairments. But, he does not describe what activities he is referring to other than the city council and sitting on a riding lawn mower for brief periods. Nor did the ALJ develop the record in detail to determine the significance of the service upon the city council or the lawn mowing. Of course, at step five, the burden of proof is on the ALJ, not plaintiff.

The ALJ notes the absence of third party affidavits in support of plaintiff's claims. The record is clear though that plaintiff tended to withdraw from social situations and isolate himself. This could help explain the lack of third party affidavits.

Plaintiff's wife testified regarding the difficulties plaintiff suffered in 1987 and 1988. She stated that plaintiff would get upset easily; that he didn't want to talk about anything; and that he would withdraw from everybody for hours at a time on a weekly frequency. He did not do errands or visit friends or even go to the grocery store. He had significant problems with sleep; some nights getting only an hour or two. She also stated that plaintiff had chronic "tremendous" back pain. (Tr. 1041). The ALJ rejects this testimony essentially on the basis of the same proof he described in rejecting the retrospective diagnoses previously discussed.

The court will not repeat the discussion of why we believe these grounds are not supported by substantial evidence. In addition, the ALJ's reasoning is circular to some degree. In other words, he rejects the retrospective medical diagnoses in part because of the lack of supporting lay testimony or evidence of plaintiff's inactivity. At the same time, he rejects plaintiff's wife's lay testimony and description of plaintiff's condition because of a lack of medical evidence.

Moreover, as noted earlier, there is some evidence that plaintiff suffered anxiety and depression in 1986. Plaintiff's alleged back pain led him to make application for disability benefits in 1987. This application was rejected without giving consideration to plaintiff's PTSD. Howev-

er, the reports of pain, themselves, may be considered some evidence of plaintiff's psychological/physical condition, since experts have considered plaintiff's complaints of pain to have a significant psychogenic overlay. (Tr. 172).

Finally, the lack of additional medical records may be explained by lack of funds to seek medical care, frustration with past medical care, or plaintiff's hesitancy to reinvolve himself in the "military" by turning to the Veterans Administration. PTSD itself and the desire to try to forget the causes and symptoms of PTSD, rather than to explore and dwell upon them, might also explain an absence of medical records.

In summary, the court has attempted to carefully review the voluminous record in this case. After doing so, the court is convinced that the ALJ's decision is not supported by substantial evidence and that the retrospective diagnoses in the record are sufficiently supported by other evidence to direct an award of benefits in this case.

Therefore, the court shall reverse the decision of the defendant and remand this case for an award of benefits consistent with a disability date of September 10, 1987.

**IT IS SO ORDERED.**